# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 18, 2013

No. 11-50482
cons. w/ 11-50484

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADRIAN EDWARDO PENA, also known as Adrian Edward Pena,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and SMITH and WIENER, Circuit Judges.
CARL E. STEWART, Chief Judge:

This case entails two appeals from Defendant-Appellant Adrian Pena's convictions and sentences for criminal offenses related to the bribery of two public officials to procure a multimillion dollar construction contract. Pena contends on appeal that the district court violated Federal Rule of Criminal Procedure 11(c)(1) by participating in his plea negotiations. Pena also asserts that the court's involvement caused his trial attorney, Thomas Stanton, to represent him under an actual conflict of interest which adversely affected Stanton's performance. Based on this alleged conflict of interest, Pena filed a motion to withdraw his guilty pleas, which the court denied. Pena appeals his

No. 11-50482
cons. w/ 11-50484

convictions and sentences, as well as the district court's denial of his motion to withdraw his guilty pleas. We VACATE Pena's guilty pleas and sentences, and REMAND for further proceedings.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.    The Instant Offenses

In 2009, Pena was arrested in El Paso, Texas, and was charged in two separate indictments for conspiracy to commit mail fraud, mail fraud, and deprivation of honest services of a public servant. The charges arose from Pena's employment with the construction company for which he worked until 2007. Both indictments alleged that Pena paid bribes to El Paso County officials to obtain a multimillion dollar construction contract for that former employer. Stanton represented Pena in both cases.

### B.    Other Proceedings Involving Pena

At the same time that Pena was facing these charges, he was working for the construction firm of his father-in-law Carlos Nunez, SDVO Contractors, L.P. ("SDVO"). SDVO was involved in three controversies regarding an Arizona construction project for the Department of Defense (DOD)—two civil lawsuits and one criminal investigation:

> 1)    *Jeffrey C. Stone, Inc. v. SDVO*[1]: a civil matter in Arizona, in which Pena was a named individual defendant;
>
> 2)    *Bank of the West v. SDVO Contractors, LP*: a civil matter that was proceeding before Judge Montalvo, where Stanton represented SDVO; and

---

[1] In January 2010, Jeffrey C. Stone, Inc., filed suit against SDVO, Nunez, Pena, Pena's wife, and others, alleging that the defendants breached a teaming contract between Jeffrey Stone and SDVO and committed various acts of misrepresentation and fraud in relation to the Arizona project. SDVO, Nunez, and the Penas were represented by local counsel and by Stanton in that proceeding.

2

No. 11-50482
cons. w/ 11-50484

3)    A criminal investigation into the Arizona project
      that potentially implicated Pena and several of
      Stanton's civil SDVO clients.

The litigation surrounding the Arizona project arose from the DOD's erroneous transfer of funds into SDVO's bank account and SDVO's subsequent withdrawal of most of those funds. Specifically, in April 2010, the United States Property and Fiscal Officer for the Arizona National Guard (USPFO) issued a termination-for-default notice to SDVO, ending the contract for the Arizona project. As a result of this termination, the USPFO demanded that the surety perform its obligation under the performance bond. In June 2010, however, the USPFO inadvertently wired a $733,720 payment for the project into SDVO's account at the Bank of the West ("the Bank"), not into the surety's bank account. When the surety and the USPFO realized the error and contacted the Bank to reverse the transaction or freeze the funds, the Bank advised that the funds had already been disbursed in their entirety, with the exception of an IRS levy placed on the account in the amount of approximately $159,000. In July 2010, the Bank filed a state interpleader action for the $159,000, naming as defendants SDVO, the IRS, and the DOD. After this interpleader action was removed to federal court, Stanton appeared as counsel for SDVO.

The criminal investigation relating to the Arizona construction project involved SDVO's alleged misappropriation of these same funds.

C.    **Pre-trial Proceedings for the Instant Offenses**

In July 2010, an Assistant United States Attorney ("AUSA") informed Stanton of an ongoing Arizona criminal investigation into SDVO. The AUSA notified Stanton that, because of that investigation, Stanton might have a conflict of interest in representing SDVO and Nunez in any criminal matters because of Stanton's representation of Pena in the instant proceedings. In

3

No. 11-50482
cons. w/ 11-50484

response to this information, Stanton affiliated separate criminal defense counsel for SDVO and Nunez.

During this same time, the government also filed a notice of its intention to use evidence of other crimes, wrongs, or acts for the instant proceedings, pursuant to Rule 404(b) of the Federal Rules of Evidence. Specifically, the government sought to adduce evidence that, in January 2010, Pena contacted a subcontractor on the Arizona project on behalf of SDVO to discuss a possible kickback of contract funds. In August 2010, a pretrial services officer sent the district court a memorandum advising that a recent FBI report contained allegations that, while out on bond, Pena had misappropriated the funds inadvertently deposited into the SDVO bank account. The court however took no action adverse to Pena as a result of this report.

**D. Plea Negotiations and the Court's Reference to the "SDVO Matter"**

On December 1, 2010, the district court held a chambers conference with the attorneys, which the court neither recorded nor transcribed. At that conference, Stanton told the district court that Pena and the government were engaged in plea negotiations and that Stanton expected those negotiations would be successful. The district court's response to this information is the focal point of this appeal.

There are three different versions of the district court's response. First, Stanton's filing on the same day as the chambers conference suggests that the court said it wanted Pena to resolve the SDVO matter before the court would accept Pena's plea. According to Stanton, the court told him that it had received information that money related to SDVO had been "missing and misapplied." Second, the government recalls the district court saying that it would give Pena full credit for acceptance of responsibility if he resolved the SDVO matter concurrently with his guilty plea to the instant offenses. Third, at a hearing in

4

No. 11-50482
cons. w/ 11-50484

May 2011, the district court stated on the record that it recalled saying that the SDVO matter should be "resolved concurrently with the resolution of this case." Likewise, the district court's order following the hearing states: "At the conference the Court mentioned [the SDVO interpleader action] and stated its opinion that the civil case should be resolved by the time of the plea hearing [for the instant offenses]." Following the court's statements, Stanton asked for the opportunity to respond to the allegations, but the court denied this request.

### E.    Stanton's Conflict-of-Interest Claim and Motion to Withdraw as Counsel

On the same day as the chambers conference, Stanton notified Pena via email that he (Stanton) might have a non-waivable conflict in representing both Pena and SDVO. Pena responded that he could not allow Stanton, "under any circumstances," to cease representing him in the SDVO matters. Pena then appears to have told Stanton that he would continue *pro se* in the instant criminal matters. Pena wrote that he would not sign the plea agreement unless it included the condition the district court had imposed and that he would request that the prosecutor enforce the condition.

Later that day, Stanton filed a motion under seal notifying the district court of his conflict of interest and asking the court to vacate the trial date and permit him to withdraw from Pena's case. Stanton reminded the court that he represented SDVO in the interpleader action regarding the same monies the court mentioned in chambers, which was pending in the same judge's court. In addition, the *Jeffrey Stone* case was pending in Arizona, and that case also "involve[d] the construction project made the basis of the Government's payment to SDVO." Although Stanton had obtained separate counsel to represent SDVO and Nunez, he "continue[d] to be one of three lawyers representing SDVO in several [civil] matters." Stanton reasoned that, because he continued to

5

No. 11-50482
cons. w/ 11-50484

represent SDVO and because the district court had ordered that the SDVO matter pending before it be resolved before it would accept Pena's plea agreement, Stanton was ethically required to: 1) notify Nunez, SDVO, and Pena of his conflict of interest; 2) inform Nunez that he could not waive the conflict as it affected Pena; 3) withdraw from the SDVO litigation; and 4) withdraw from representing Pena. Stanton stated that, although he could not disclose the full extent of the conflict, he could not recommend that Pena accept terms that Stanton could not accomplish ethically and that were unenforceable.

Stanton also told the district court that, in response to the chambers conference, Pena had directed him to remain as his counsel in the SDVO litigation, but that Stanton believed this request was against both Pena's and Stanton's interests. Stanton asked the court to: 1) vacate the trial date; 2) recuse itself or reassign the case; 3) permit Stanton to withdraw; 4) accept the plea based on the terms the parties had discussed prior to the chambers conference; and 5) not factor in the SDVO litigation for any sentencing matters.

The district judge's law clerk phoned the parties the next day, December 2, 2010. The law clerk told the parties that the court had changed its mind about the need to resolve the SDVO matter before the court would accept Pena's plea and that the parties were to "disregard" its statement.[2]

**F.    Plea Agreements and Guilty Plea Hearing**

Four days later, on December 6, 2010, Pena signed plea agreements in both cases, admitting to the conspiracy charges in the first count of each indictment. The government agreed to ask that Pena not be sentenced until he

---

[2] A minute entry on the docket reflects that the court denied Stanton's motion to withdraw on December 3, 2010. However, the court's sealed order dated May 18, 2011 notes that "the electronic file notation denying Stanton's Motion to Withdraw . . . was not entered until May 11, 2011"–five months after Pena pleaded guilty.

No. 11-50482
cons. w/ 11-50484

had been fully debriefed so that the government might request a lower sentence under U.S.S.G. § 5K1.1 for substantial assistance.

During the hearing, the district court followed the standard plea colloquy procedure under Rule 11. The court was also especially concerned about Pena's "duty of financial candor," which was a condition of his plea agreement:

> THE COURT: Mr. Pena, before I preliminarily accept your guilty plea, I need to direct your attention to the duty of financial candor section contained in both plea agreements in both of these cases. . . . I am going to instruct my probation officer within ten days of today to set up a meeting with you in which you are going to disclose the totality of your financial dealings, who have you given money to recently, say in the last year, that is out of the ordinary. Anything that that [sic] probation officer asks you about your finances, you are going to answer.

Pena confirmed his understanding of these terms. The court subsequently accepted Pena's guilty pleas and set sentencing for April 20, 2011.

## G.    Pena's *Pro Se* Activity Related to His Debriefings and Sentencing

Prior to Pena's sentencing, he engaged in significant *pro se* activity related to his debriefings with the government and his upcoming sentencing. For example, Pena, *pro se*, sent various communications to the probation officer, including:[3]

- In a letter to the probation officer dated February 2, 2011, Pena lodged legal challenges to the factual basis for his plea, arguing, *inter alia*, that the facts did not match the indictment.

- In a February 11, 2011 letter to the probation officer, Pena expressed frustration that he had been unable to fully comply with his plea. He pointed to the plea

---

[3] Pena later attached these letters as exhibits to his *pro se* motion to continue the sentencing and replace counsel, which he filed on April 15, 2011.

agreement's "duty of financial candor" section to illustrate that he was attempting to comply with the district court's demand that he resolve the SDVO matter. He wrote that he had insisted "the court's request to 'resolve the SDVO matter'. . . prior to having plead [sic], but my attorney and the AUSA refused to include the resolving of the SDVO matter in my plea." Pena also referred to his debriefings, his duty of financial candor in his plea agreement, and the court's request to resolve the SDVO matter, writing, "I WANT TO CONTINUE TO COMPLY!"

- On March 14, 2011, Pena submitted "Self-Provided Presentencing Supporting Information" to assist the probation officer with composing his presentence investigation report ("PSR").

- Also on March 14, Pena wrote to the probation officer: "For the Record, I have provided 'Substantial Assistance,' but unfortunately without Counsel. I do not and never wish to have or be represented especially during any debriefings. In respecting the Court's Demand to resolve certain matters, I have been without counsel and do not wish to ever waive this right."

In virtually all of his *pro se* communications, Pena indicated that he was without counsel and requested assistance from the probation officer.

**H.     Pena's *Pro Se* Conflict and Judicial Participation Claims, and Pena's Request to Withdraw His Plea**

On April 15, 2011, Pena, *pro se*, filed a motion to continue sentencing and replace counsel, to which he attached copies of the above-referenced communications, in addition to others. In the documents, Pena asserted that the PSR that the probation officer had recently filed evidenced an ongoing conflict between Pena and Stanton. The PSR listed the SDVO matter under "Pending Charges." The PSR also contained information that some of the SDVO monies

had been transferred to Stanton's Interest on Lawyer's Trust Account ("IOLTA").[4]  Pena explained that these funds were the source of Stanton's conflict of interest, both because Stanton was operating under a duty to protect the funds on behalf of SDVO in the civil suit and because there was an ongoing *criminal* investigation into these same funds which potentially implicated Stanton and his SDVO civil clients.

Pena also pointed out that he had already begun extensive debriefings with the government in the hope of favorable treatment at sentencing, but that Stanton was not present at about 80 percent of those debriefings.  According to Pena, Stanton did not attend the debriefings "due to the conflict with the court requested SDVO resolution."  He wrote: "Defendant's Counsel cannot fight, rebut[ ] and/or respond to the prosecution [to reap the benefits [of] the 5K section and substantial assistance section] because of the inability to explain in detail to the court all of the information provided to the prosecution about SDVO by defendant."  In one of the attachments, Pena stated that Stanton "cannot effectively represent me when discussions ONLY about my old employer SDVO are taking place."

In its response to Pena's motion, the government stated its belief that the fact that Pena continued with plea negotiations after the court withdrew the SDVO condition suggested that no harm had been done.  The government maintained that the district court was under no obligation to investigate Stanton's and Pena's claims that Stanton was conflicted in the case because Pena had pointed to no actual conflict.  According to the government, Stanton's representation of SDVO did not render him conflicted in the matter of Pena's

---

[4] If a lawyer holds any funds which do not belong to the lawyer, then those funds must be held in a separate account designated as "trust" or "escrow," which is the purpose of the IOLTA.  *See* Tex. Disciplinary R. Prof'l Conduct 1.14(a).

No. 11-50482
cons. w/ 11-50484

debriefings because the government, not defense counsel, decides whether a defendant has debriefed truthfully and fully.

In his reply to this motion, Pena requested to withdraw his guilty plea because he had pled on the advice of conflicted counsel. In this filing, he twice referred to the district court's "inserting itself into plea negotiations" as the cause of the conflict. He wrote: "The court was knowingly aware of the potential conflict by motion, within 13 hours of defendant's counsel's known awareness that there was in fact a potential conflict made by the court inserting itself in the plea negotiations of December 1, 2010 and making its knowledge of the conflict known." He also wrote: "On December 1, 2010 defendant's counsel was made aware of the potential conflict by which the court inserted itself in the plea negotiations at the Chamber's Conference held."

The government responded separately to Pena's request to withdraw his pleas, arguing that, at the plea colloquy, Pena said he was pleading knowingly and voluntarily and that he was satisfied with his counsel: The government indicated its belief that the court had complied with Rule 11 during the colloquy. The government also noted that Pena had not asserted that he was not guilty of the charges.

## I.     Stanton's Post-plea Conflict Claims

In Stanton's separate filing on April 18, 2011, he renewed his request to withdraw as counsel. He stated: "I agree [with Pena] that I have a conflict consistent with my representations to the Court under seal on December 1, 2010. However, until the Court makes a determination, I am ethically bound to file on behalf of Mr. Pena objections" to the PSR. Stanton wrote that he was proceeding even though, on the same day as his filing, Pena "reaffirmed to [Stanton] to not proceed in his defense because of the conflict of interest . . . that he has not waived."

10

No. 11-50482
cons. w/ 11-50484

Stanton objected, *inter alia*, to the PSR's inclusion of matters regarding the disputed SDVO monies and inaccuracies relating to this information. Stanton told the court that the paragraphs alleging that Pena had misappropriated funds raise a conflict of interest because Stanton represented SDVO and Carlos Nunez in civil matters directly related to these matters. SDVO had waived a conflict of Stanton's representation of Pena only "so long as the representation does not bar [Stanton] from proceeding in the defense of SDVO and Nunez on the civil matters." Stanton also stated that he had "proceeded in representation on the two guilty pleas in reliance on the Court's statement to disregard the matters the Court raised *sua sponte* relating to SDVO." He asked the court to strike the paragraphs relating to SDVO, "consistent with the Court's statement to [Stanton] to disregard its earlier requirement that the SDVO matters be resolved."

## J.    Hearing on Pending Motions to Withdraw Counsel and to Withdraw Guilty Plea

The district court held a hearing on May 11, 2011.[5] The court said that, in its view, it had mooted Stanton's post-conference conflict claim when it notified the parties that it was withdrawing its requirement that the SDVO litigation be resolved before it accepted Pena's plea. It noted that Pena had pleaded guilty and ordered the probation officer to prepare an amended PSR to remove references to the SDVO "because, frankly, it is erroneously referred to as a pending charge, and it is not."

Pena represented himself at this hearing, although Stanton was also present. Pena told the district court that Stanton's conflict arose from the criminal investigation into SDVO. He said that, based on his debriefings with

---

[5] On that same day, the docket was amended to reflect that the district court had denied the first motion to withdraw on December 3, 2010.

the government, he understood that the investigation was continuing and that he was a target. The subject matter of the investigation, Pena pointed out, was missing funds, "the funds that [had] been deposited into [Stanton's] trust." Pena told the court that Stanton "could have possibly been working under the loyalty of protecting the funds, the funds that belong to an employer, or protecting the company."

When offered an opportunity to speak, Stanton stated:

> Your honor, my ethical requirements are to not take a position inconsistent with my client. The Court has before it my notice to the Court in response to his motion to withdraw. The Court directed me to remain his counsel. I am doing so. And I have nothing further to add today.

The district court advised Pena that it would not consider anything relating to the SDVO civil case or any pending criminal investigation in determining Pena's sentence. The district court confirmed that, after Stanton filed his December 1, 2010 motion to withdraw, he received notification, through the judge's law clerk, that the judge would not consider the SDVO matter with respect to Pena's guilty pleas. The district court described the conflict as an "obscurely described potential conflict having to do with an investigation out there." It stated that it would not factor in the investigation at sentencing. At the end of the hearing, the district court, *sua sponte*, revoked Pena's bond in the belief that Pena's *pro se* motions evidenced his failure to accept responsibility for his actions.

The district court denied Pena's *pro se* motions in a subsequent sealed order on May 18, 2011. This order reflected the court's oral statements at the hearing that it did not believe Pena had pointed to an actual conflict. The court also characterized any conflict stemming from the government's intent to use the Rule 404(b) evidence as "hypothetical." In relevant part, the order stated:

No. 11-50482
cons. w/ 11-50484

> Pena appears to conflate three distinct SDVO matters. *Bank of West v. SDVO Contractors* . . . is a civil case currently pending before this Court. The Court conducted an in-chambers conference with both parties on December 1, 2010. At the conference the Court mentioned this civil case and stated its opinion that the civil case should be resolved by the time of the plea hearing. After further deliberation, the Court decided the civil case was proceeding in a timely manner and there was no reason to impose such a requirement. . . .
>
> The third SDVO matter is an apparent criminal investigation in Arizona. The Court gleaned information about the third SDVO matter from the United States Pretrial Services . . . On August 3, 2010, Pretrial Services sent a Memorandum to the Court reporting a possible bond violation by Pena. . . . The information related to conduct of Pena in connection to SDVO.

The district court concluded: "Pena does not identify how simultaneously representing SDVO in a civil matter and Pena in the above-captioned criminal cases present a conflict." The court also concluded that Pena's plea colloquy demonstrated that his pleas were knowing and voluntary, and that he was satisfied with his counsel's representation. The court then denied Pena's motions requesting to replace counsel and to withdraw his guilty pleas.

## K.    Sentencing

At the sentencing hearing, the court first established that Pena did not have Stanton or other counsel present with him at the PSR interview. The court then sentenced Pena to a total of 76 months of imprisonment, consisting of two 63-month terms, with 13 months in one case to be served consecutively to the sentence imposed in the other. The court also ordered that Pena serve concurrent three-year terms of supervised release and fined him $125,000 in each case (for a total fine of $250,000).

No. 11-50482
cons. w/ 11-50484

Pena timely appealed both of his convictions and sentences. These appeals have been consolidated for our consideration.

## II. DISCUSSION

### A.    Judicial Participation in Plea Negotiations

#### 1.    *Applicable Law*

Rule 11 allows a district court to accept or reject a plea agreement. Fed. R. Crim. P. 11(c)(4) - (5). Further, "a court must be free, in certain respects, to take an 'active role' once the agreement is disclosed." *United States v. Miles*, 10 F.3d 1135, 1140 (5th Cir. 1993) (citation omitted). In fact, the rule mandates this scrutiny. *See id.* (citations omitted). Rule 11 also requires that the district court "address the defendant personally in open court and determine that the plea is voluntary and did not result from force, threats, or promises (other than promises in a plea agreement)," and "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(2), (b)(3).

However, Rule 11 prohibits the sentencing court from participating in plea negotiations: "An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. *The court must not participate in these discussions.*" Fed. R. Crim. P. 11(c) (emphasis added). We have characterized Rule 11's prohibition of judicial involvement as a "bright line rule," *United States v. Rodriguez*, 197 F.3d 156, 158 (5th Cir. 1999), and "an absolute prohibition on all forms of judicial participation in or interference with the plea negotiation process," *United States v. Adams*, 634 F.2d 830, 835 (5th Cir. Unit A Jan. 1981).[6] Thus, while the rule "requires

---

[6] Westlaw and Lexis have designated *United States v. Adams* as "superseded" by statute or regulation based on the reasoning of non-Fifth Circuit cases that *Adams* was decided prior to the enactment of the U.S. Sentencing Guidelines. However, we have relied on *Adams* in full, including its remedy, as recently as 2010. *See United States v. Self*, 596 F.3d 245, 250 (5th Cir. 2010) (relying on *Adams* to vacate the defendant's conviction and sentence and to reassign to a different judge on remand following the district court's participation in

No. 11-50482
cons. w/ 11-50484

that a district court explore a plea agreement once disclosed in open court[,] . . . it does not license discussion of a hypothetical agreement that it may prefer." *Miles*, 10 F.3d at 1140 (citation omitted).

We have recognized this bright line rule for several reasons. First, "it serves to diminish the possibility of judicial coercion of a guilty plea, regardless of whether the coercion would cause an involuntary, unconstitutional plea." *Id.* at 1139 (citations omitted). Indeed, "pressure is inherent in *any* involvement by a judge in the plea negotiation process." *Rodriguez*, 197 F.3d at 159. Second, "such involvement 'is likely to impair the trial court's impartiality. The judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement . . . and may therefore resent the defendant who rejects his advice.'" *Miles*, 10 F.3d at 1139 (omission in original) (citations omitted). Third, a judge's "participation in plea discussions creates a misleading impression of the judge's role in the proceedings. As a result of his participation, the judge is no longer a judicial officer or a neutral arbiter." *Id.* (citations and internal quotation marks omitted). Rather, the judge "becomes or seems to become an advocate for the resolution he has suggested to the defendant." *Id.* (citations and internal quotation marks omitted).

### 2.    *The Parties' Arguments*

Pena alleges that the district court violated Rule 11 when it participated in plea negotiations by stating that Pena should resolve the "SDVO matter" before the court would accept his guilty plea for the instant offenses. Pena argues that the court improperly proposed a "hypothetical agreement," as it "attempted to resolve a pending civil matter and possible criminal allegations

---

plea negotiations). Thus, while these sources categorize *Adams* as no longer good law in part, this designation is incorrect.

15

against Pena by conditioning acceptance of Pena's plea on resolution of those matters."

The government maintains that the district court's comments "did not rise to the level of participation," as they "are best characterized as an off-the-cuff attempt to shape the administrative conditions under which it would accept the plea itself, and not an injection into the discussion of the terms of the agreement."

### 3.    *Discussion*

Given the sanctity of Rule 11's absolute prohibition on any form of judicial involvement in plea negotiations, we conclude that, albeit unintentionally, the district court here stepped over the line and violated Rule 11 when it suggested that Pena must resolve the SDVO matter before the court would accept Pena's plea in the instant offenses. *See Crowell*, 60 F.3d at 203 (citing *Miles*, 10 F.3d at 1139-40) ("When a court goes beyond providing reasons for rejecting the agreement presented and comments on the hypothetical agreements it would or would not accept, it crosses over the line established by Rule 11 and becomes involved in the negotiations.")).

As noted, Pena and the government present different accounts of exactly what the district court said during the off-the-record chambers conference, in addition to the court's own assertion of what it said. Pena asserts that the district court said that it would not accept a plea unless Pena first resolved the SDVO matter by returning monies that the district court believed Pena had misappropriated. The government asserts that the district court said it would give Pena full credit for acceptance of responsibility if he resolved the SDVO matter concurrently with his plea in the instant proceedings. The government also maintains that the specific SDVO matter that the court referred to was the interpleader action, which was also pending before the district court. The

No. 11-50482
cons. w/ 11-50484

district court likewise suggested at both the hearing and in its order in May 2011 that it told Pena that he should resolve the civil interpleader action prior to pleading guilty to the instant offenses. Regardless, we agree with Pena that any version constitutes participation in plea negotiations in violation of Rule 11, for several reasons.

First, the district court's statements connote the *possibility* that the court had already made a determination as to Pena's guilt in the instant offenses and preferred a guilty plea. *See Rodriguez*, 197 F.3d at 160 ("The clear implication of the judge's statements at the pretrial hearing was that the judge desired a plea."); *Miles*, 10 F.3d at 1141 ("By trying to facilitate a plea bargain, the judge indicated that he desired an agreement; this is pressure enough." (quoting *United States v. Barrett*, 982 F.2d 193, 196 (6th Cir. 1992))). In particular, both the government's and the district court's versions of the court's statements would constitute the court's own plea bargain. *See Adams*, 634 F.2d at 836 (concluding that the district court participated in plea negotiations when "the judge offered a plea bargain to [the defendant] on her own initiative"). The district court's statements also implied that Pena was liable for wrongdoing, *i.e.*, misappropriating funds, in an unrelated matter.

Second, the fact that the court made the statements while plea negotiations between Pena and the government were ongoing is crucial: We have noted the distinction between a sentencing court's comments *before* the parties have disclosed the terms to the court and the court's statements *after* this time. *See Crowell*, 60 F.3d at 204. For instance, in *Crowell*, the district court's comments reflected its "feeling that a penalty significantly more severe than that allowed under the first plea agreement would be necessary for an agreement to be acceptable," which the court made known to the parties before the second agreement was in final form. *Id.* at 204. We stated, "the fact that

17

this comment was injected into the discussions while the parties were still preparing the second agreement is critical. It is precisely this type of participation that is prohibited by Rule 11." *Id.*

The instant case is similar to *United States v. Daigle*, in which we concluded that the district court erred by participating in plea negotiations when it engaged in an off-the-record discussion with the parties in chambers regarding the defendant's guilty plea and sentence. 63 F.3d 346, 347 (5th Cir. 1995). During the chambers conference in *Daigle*, the district court informed the defendant that, if "he fully cooperated, that 90% of the time [the court] will follow the [sentencing] recommendation of the U.S. Attorney." *Id.* at 347, 349. The defendant understood this statement to mean a nine-year "cap" of prison time based on the court's statements during the subsequent guilty plea hearing. *Id.* at 348. At that hearing, the court stated: "All right, so if nine years is what y'all agreed upon and that's the recommendation made to me, and there is substantial cooperation, that's the cap of nine years, okay?" *Id.* at 348-49. We concluded that the district court participated in the plea negotiations based on the court's statement that it follows the government's sentencing recommendation "90% of the time" if the defendant cooperates. *Id.* at 349. We noted that the district court's statement during the hearing "strongly support[ed] [the defendant's] contention that he understood the court to be indicating a 'cap' of nine years if the government so recommended." *See id.* at 348-49.

Here, the government's principal argument against the conclusion that the district court's statements constituted involvement is that the comments "did not rise to the level of participation." Rather, insists the government, the statements "are best characterized as an off-the-cuff attempt to shape the administrative conditions under which it would accept the plea itself, and not an injection into the discussion of the terms of the agreement." Commendably,

however, the government also concedes that Pena's interpretation of the district court's statements is reasonable–that they reflected the court's insertion of a "condition" into the terms of his plea. *See, e.g.*, *United States v. Ekwerekwu*, No. 93-9126, 1995 WL 136519, at *3 (5th Cir. Mar. 17, 1995) (vacating and remanding the defendant's conviction and sentence after concluding that the district court participated in plea negotiations and noting that we "must appropriately consider Ekwerekwu's reasonable perception" of the district court's potential lack of objectivity).  It is also noteworthy that the government's argument on this issue focuses more on the harmlessness of the court's statements than on whether the statements constituted error under Rule 11 in the first instance.

We conclude that the district court participated in Pena's plea negotiations in violation of Rule 11.  Although the record discloses no basis to conclude that the court's error was intentional, we nevertheless must heed Rule 11's bright-line prohibition of all judicial participation in plea negotiations and recognize the district court's error.  *See Barrett*, 982 F.2d at 196 ("Regardless of the judge's objectivity, it is the defendant's perception of the judge that will determine whether the defendant will feel coerced to enter a plea.") (citation omitted).  This error was plain in light of our well-settled circuit law prohibiting a court's participation in plea negotiations.

**B.    Effect on Pena's Substantial Rights**

While the parties dispute whether harmless error or plain-error review applies in this case, we pretermit a determination of this issue.  Even assuming *arguendo* that plain-error review applies, we conclude that we must exercise our discretion to reverse the district court.

*1.    Applicable Law*

No. 11-50482
cons. w/ 11-50484

Under the Federal Rules of Criminal Procedure, "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b); *see United States v. Vonn*, 535 U.S. 55, 58-59, 62, 74 (2002) (applying plain-error review to unpreserved Rule 11 error, notwithstanding Rule 11's provision that a variance from the requirements of the rule is harmless error if the error does not affect substantial rights (citing Fed. R. Crim. P. 11(h))); *see also United States v. Davila*, No. 12-167, 569 U.S. ___, 2013 U.S. LEXIS 4541, at *24-25 (U.S. June 13, 2013) (reaffirming that plain-error review, rather than automatic vacatur, governs unpreserved Rule 11 error). "To affect the defendant's substantial rights, the defendant must demonstrate that the error affected the outcome of the district court proceedings." *United States v. Broussard*, 669 F.3d 537, 553 (5th Cir. 2012) (citations omitted). "[A] defendant who seeks reversal of his conviction after a guilty plea, on the ground that the district court committed plain error under Rule 11, must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). Lastly, under the final prong of plain-error review, "[w]e will exercise our discretion to correct plain error if it seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Broussard*, 669 F.3d at 553 (alteration in original) (citation omitted).

### 2.    *The Parties' Arguments*

Pena contends that three things are evident from the record:  1) The district court's condition was inherently coercive and became the focal point of the plea negotiations; 2) that condition created or revealed a conflict of interest between Pena and Stanton; and 3) neither the court's attempt to withdraw its condition nor Pena's guilty plea could ameliorate the harm resulting from the court's statements.  Pena points out that the district court's request prompted

Stanton's motion to withdraw as counsel because of the conflict.   Pena argues that, although Stanton did not specify the complete nature of the conflict at that time, he intimated to the district court that he was incapable of disclosing the conflict in full.  Subsequent proceedings revealed that Stanton held a portion of the disputed SDVO monies in his attorney trust account.  Meanwhile, Pena continued to be debriefed by the government regarding these same monies in light of his perception that the court wanted the matter resolved prior to his sentencing and the government's apparent interest in this information.  These debriefings potentially exposed Stanton's civil SDVO clients to criminal liability.[7]

The government argues that, even if the district court erred, Pena cannot show any harm because:  1) Pena had already decided to plead guilty when the court made the statement;  2) Pena's plea colloquy demonstrates that his plea was knowing and voluntary; and 3) the court withdrew the condition relating to resolution of the "SDVO matter" soon after it made its statement to the parties.  The government further asserts that the SDVO matter and the instant cases are completely unrelated, and thus any alleged conflict between Pena and Stanton is specious.

*3.    Discussion*

The Supreme Court recently emphasized that "[v]acatur of [a] plea is not in order if the record shows no prejudice to [a defendant]'s *decision to plead guilty*." *Davila*, 2013 U.S. LEXIS 4541, at *8 (emphasis added).  Thus, although the primary focus of our prejudice analysis must be the period between the district court's participation and Pena's guilty pleas, our review is also "informed by the entire record." *Dominguez Benitez*, 542 U.S. at 83.  The district court indicated that it would not accept Pena's pleas unless Pena also resolved the

---

[7] The government confirmed during oral argument that it has now indicted several of Stanton's clients, as well as Pena, for wrongdoing related to the SDVO monies.

No. 11-50482
cons. w/ 11-50484

SDVO matter; that statement amounts to a hypothetical agreement that the court preferred.[8] Just five days later, Pena pled guilty—a temporal proximity that supports a finding of prejudice. *See Davila*, 2013 U.S. LEXIS 4541, at \*26 (contrasting a plea that follows "soon after" judicial participation with a three-month delay).

The government maintains that even if the district court impermissibly participated in Pena's plea negotiations, that error did not affect Pena's substantial rights, because he had already decided to plead guilty.[9] As Pena notes, however, plea negotiations were merely ongoing, and the parties had disclosed no terms to the court. This distinction is crucial, as we have already discussed. *See Crowell*, 60 F.3d at 204 (citation omitted). Stanton's motion to withdraw, moreover, asserted that "Defendant Pena continues to wish to enter a plea under the terms which were the subject of the *general agreement* of the parties prior to the declaration of the Court setting out a resolution of the SDVO claims." That contemporaneous account indicates that there was no definite agreement in advance of the district court's participation.

In *Rodriguez*, we specifically rejected the government's argument that, because the defendant had already negotiated a plea with the government before

---

[8] Alternatively, according to the government, the district court said that it would grant Pena full credit for acceptance of responsibility if he resolved the SDVO matter before entering his plea. According to the court, it stated that Pena should resolve the civil SDVO matter before his plea in the instant proceedings. These statements would constitute a plea bargain.

[9] Although the government assessed the impact of the court's condition under a harmless-error standard, its arguments are still germane to our plain-error analysis. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (citations omitted) (clarifying that the third prong of plain-error review—that the error must "affec[t] substantial rights"—"is the same language employed in [Federal Rule of Criminal Procedure] 52(a) ['Harmless Error'], and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings."); *see also* 28 Moore's Federal Practice § 652.04[4], at 652-30 to -32 (Daniel R. Coquillette et al. eds., 3d ed. 2013) (citations omitted) ("The *Olano* Court pointed out that [whether obvious error 'affect[s] substantial rights'] is exactly that same standard applied in harmless error review under Rule 52(a)[.]").

the district court's participation in plea negotiations, the court's error did not impact the proceedings, because we knew the precise agreement that would have resulted in the case. *See Rodriguez*, 197 F.3d at 160 n.15. We stated that, by making that argument, "the government ignores what we do not know—whether [the defendant] would have entered the agreement at all absent the judge's involvement." *Id.* We thus concluded that the district court's statements pressured the defendant to plead guilty, even though the statements did not alter the terms of the previously negotiated agreement, because "Rule 11 applies to *all* forms of participation." *Id.* at 157-59, 160 n.15; *see also Miles*, 10 F.3d at 1141.

Even though the district court told the parties that it was withdrawing the condition and that they should "disregard" it, the record evidences that the "withdrawal" did not alter Pena's perception of the court's desired disposition. Pena still thought that he needed to resolve the SDVO matter to the extent that he could before entering his pleas. As we observed in *Rodriguez*:

> Once the judge placed pressures on Rodriguez, their impact could not be so readily alleviated. The clear implication of the judge's statements at the pretrial hearing was that the judge desired a plea. It is reasonable to doubt that any amount of explanation from Rodriguez's attorney could have cured the impression likely left in Rodriguez's mind that "refusal to accept the judge's preferred disposition would be punished."

*Rodriguez*, 197 F.3d at 160 (citations omitted); *see also Miles*, 10 F.3d at 1141.

The record also suggests that, by imposing and then quickly retracting a unilateral condition, the district court unintentionally induced Pena—who might have otherwise continued bargaining—to plead guilty quickly, lest the court change its mind again. The pre-plea proceedings before the court, therefore, illustrate one of the core concerns that Rule 11 was intended to combat, *i.e.*, the

No. 11-50482
cons. w/ 11-50484

indeterminate effects of the court's involvement in plea negotiations, even if only in the defendant's mind. *See Miles*, 10 F.3d at 1141 (citing *Barrett*, 982 F.2d at 194 ("By intervening to facilitate a plea, . . . the judge communicated to the defendant that he desired a plea. He thereby raised the possibility, if only in the defendant's mind, that a refusal to accept the judge's preferred disposition would be punished."))[10]

Subsequent proceedings also illustrate the impact of the court's condition on Pena's perception of the terms of his guilty pleas: He persisted in trying to do something about the SDVO matter long after the district court had retracted its plea condition. One of Pena's *pro se* filings alleged that he had attempted to include resolution of the SDVO matter in his plea agreements following the court's withdrawal of the condition, but the attorneys did not include that term. Further, Pena's communications with the probation officer indicate that Pena interpreted the "duty of financial candor" provision in his plea agreement—which the district court highlighted during the plea hearing—to *include* candor with respect to the SDVO matter specifically. The district court's emphasis on this section of Pena's plea agreement likely reaffirmed, in Pena's mind, the court's desired disposition relating to the SDVO matter, even if that was not the court's actual intent.[11] *See Adams*, 634 F.2d at 841 (citation omitted). Pena's

---

[10] *Davila* cites *Miles* with apparent favor. *See Davila*, 2013 U.S. LEXIS 4541, at *15 n.2.

[11] Again, the district court said to Pena:

> I need to direct your attention to the duty of financial candor section contained in both plea agreements in both of these cases . . . . I am going to instruct my probation officer within ten days of today to set up a meeting with you in which you are going to disclose the totality of your financial dealings, who have you given money to recently, say in the last year, that is out of the ordinary.

24

decision to proceed without counsel during most of his debriefings and in his communications with the probation officer demonstrates the far-reaching impact of the district court's involvement in the plea negotiations. We conclude that the participation affected Pena's substantial rights, because it was "sufficient to undermine confidence in the outcome of the proceeding." *Dominguez Benitez*, 542 U.S. at 83 (citation omitted).

Finally, "we do not view the fourth prong [of plain-error review] as automatic if the other three prongs are met." *United States v. Escalante-Reyes*, 689 F.3d 415, 425 (5th Cir. 2012) (en banc) (citation omitted). Further, the Supreme Court recently re-emphasized the inherent "screening criteria" contained within the plain-error rule, under which a defendant's failure to object "may well count against" the grant of relief. *See Henderson v. United States*, 133 S. Ct. 1121, 1130 (2013).

Recognizing Pena's high burden of demonstrating prejudice on plain-error review, we nevertheless conclude that the district court's participation in the plea negotiations warrants reversal in this case. For all of the reasons we have discussed, the district court's error "seriously affected the fairness, integrity, [and] public reputation of the judicial proceeding." *See Broussard*, 669 F.3d at 553 (citation omitted). The district court's participation precipitated Pena's efforts to "resolve the SDVO matter" through his pleas and debriefings, caused him to proceed *pro se* in most subsequent proceedings before the district court, and revealed a potential conflict of interest between Pena and Stanton and undermines confidence in the resulting plea deal. In these ways, this case presents those exceptional circumstances that warrant reversal on plain error. *Adams*, 634 F.2d at 836 (concluding that the fourth prong was satisfied after judicial participation in plea discussions). *See United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, . . . appellate courts, in the

public interest, may . . . notice errors to which no exception has been taken[.]");
*see also United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1984)) (noting that the plain-error rule should be employed when "a miscarriage of justice would otherwise result").

We applaud the district judge's recognition of his error when he attempted to ameliorate the potential effects of his statements by communicating to the parties, through his law clerk, that they were to disregard the condition. Despite the best efforts of the trial judge, however, his comments had unintended consequences. Thus, in light of our precedents, the appropriate remedy is vacatur of Pena's guilty pleas and sentences and reassignment of his cases to a different judge on remand. *See Daigle*, 63 F.3d at 349 ("'[I]n order to extend the prophylactic scheme established by Rule 11,' this case will be assigned to a different judge on remand." (quoting *Miles*, 10 F.3d at 1142)).

### III. CONCLUSION

For the foregoing reasons, we VACATE Pena's guilty pleas and sentences, and we REMAND for further proceedings before a different district judge.