# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 13-50267

———

United States Court of Appeals
Fifth Circuit

**FILED**
May 2, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

EMMANUEL ANTIONE HEMPHILL, also known as Emmanuel Hemphill, also known as Emanuel Hemphill,

Defendant-Appellant

———

Appeals from the United States District Court
for the Western District of Texas

———

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

Emmanuel Hemphill pleaded guilty to one count of conspiracy to possess with intent to distribute cocaine base and one count of possession with intent to distribute cocaine base. The district court sentenced him consistent with the plea agreement to concurrent terms of five years on each count. Hemphill now appeals, contending that the district court improperly engaged in the plea negotiations. We VACATE Hemphill's conviction and REMAND for further proceedings.

No. 13-50267

I.

In March and April 2012 police used a confidential informant (CI) to purchase crack cocaine from Hemphill on two separate occasions. During at least one of the encounters, the CI wore a concealed video camera to record his interaction with Hemphill. The Government indicted Hemphill for conspiracy and substantive drug offenses, and it filed a notice of enhanced penalty pursuant to 21 U.S.C. § 851. Although he was represented by counsel, Hemphill filed several pro se motions concerning suppression and other issues. Trial was set to begin on September 24, 2012.

On September 20, 2012, the district court conducted a pretrial docket call. Defense counsel announced that the defense was ready to proceed with trial as scheduled. The district court then noted that Hemphill faced two different charges, which could result in consecutive sentences. The court asked the prosecutor about the statutory minimum and maximum sentences, and the prosecutor informed the court that because of the notice of enhancement Hemphill faced a minimum of ten years and a maximum of life in prison. The court addressed Hemphill personally, stating that it "did not want to get too much involved in this, but you look like a nice young fellow." The district court noted that the handwriting on Hemphill's pro se motions was the same as on motions filed by a defendant named Williams, who had appeared before the court the previous week. The district judge stated that Williams had been charged with similar crimes as Hemphill and had been facing a minimum of twenty years in prison, although the Government had offered a five year plea deal. The court stated, "[a]nd the case took a day and a half, two days. I mean I've got plenty of time." The court then stated:

> So that's not a problem if you want to do that. But I -- and by the way, we went through a very extensive, because of -- and you may want to do this. I mean, it's up to you. There's a recent Supreme Court case where -- it was on a writ I think. But at any

rate, the allegation was -- and I guess there were findings or something.  But it got sent back because there wasn't anything in the record that defense counsel had affirmatively explained to the defendant the downside of going to trial and losing.  And so, frankly, given that case, I think we need to do that.  In the case last week . . . the defense counsel acknowledged that he had told the defendant the same thing.  So the defendant knew that if he went to trial, it was going from five to twenty.  Now, obviously I've said that, but that's not – I'm not his lawyer.  I mean, I've said what happened last week.

In response to the court's inquiry, the prosecutor then informed the court that the Government had offered Hemphill a plea agreement with an agreed-to sentence of seven years.  Defense counsel confirmed that he had discussed the plea offer with Hemphill.  Nevertheless, the district court then discussed the sentencing guidelines and Hemphill's potential criminal history score, which could have led to a fifteen to twenty year sentence, and the court stated, "Well, Mr. Hemphill, I'm going to tell you one other true story, and then I'm going to give you 15 minutes to confer with [defense counsel] to decide."

The court then engaged in an extensive colloquy about two defendants, the Nutall brothers, who had appeared before the court facing robbery charges many years earlier.  The court told Hemphill that the Government had offered the Nutall brothers seven years, but rather than accept the deal they had listened to the advice of a relative instead of their lawyers.  They proceeded to trial, were found guilty, and were sentenced to 35 years in prison.  The court explained that several years later the Nutall brothers wrote letters to the court, that they had been model prisoners, and that the court felt sorry for them and wanted to help get them released.  The court was unable to do so, however, because the Government would not agree to release them.  The court then stated:

> So the Court doesn't have any choice.  And I don't know whether ten years from now if [the prosecutor] would do something

different or not, although [the prosecutor] and I may not be here ten years from now.  But you'll still be in prison if you lose.  You understand that?

Hemphill asked the court several questions about the court's impartiality, and the court assured Hemphill that it "was not for anybody." Hemphill stated, however, that "I'm not going to lay down because the federal people have a 90 something conviction rate on something that I feel like it's not – it's not righteous.  That's not cool."  The court stated that it was up to the jury.

The court turned to a discussion of Hemphill's pro se motions.  During this discussion, it was revealed to the court that the CI had worn a recording device.  The district court immediately returned to the earlier case of Williams and informed Hemphill that in Williams's case there had also been video and audio recordings admitted at Williams's trial.  The court stated that "we had a big screen TV here showing Mr. Williams getting into the car, talking about all the drug stuff. . . .  And the jury found him guilty."  Hemphill said he had a different argument to make, but the court noted "that's factual stuff as to whether the jury wants to believe beyond a reasonable doubt the testimony of the . . . undercover agent."  The court denied Hemphill's motions and stated "what that leaves then are the facts that the government says it can prove. That's not up to me.  It's up to the jury.  And so if you want to do that, we're going to do it Monday morning.  So you've got 15 minutes to confer."  Because Hemphill wanted to proceed to trial, defense counsel said there was no need to confer.  The court then proceeded to take up other pretrial matters in anticipation of trial the following Monday.

On the scheduled trial date, Monday, September 24, 2012, the Government stated that over the weekend it had discovered two additional videotapes involving its witnesses that it was disclosing to the defense.  It

further indicated that it was disclosing information about recorded telephone calls that Hemphill had allegedly made from the jail. The telephone calls allegedly involved a threat against the CI, who also had been shot at by someone.

The district court indicated that, although it had not listened to the telephone recordings, they could have "a serious bearing" on its sentencing decision if the jury found Hemphill guilty. It was eventually determined that Hemphill was not involved in any threats, but before that fact was known, the district court stated at the September 24 proceedings that Hemphill should be given additional time to consider the Government's plea offer.

The Government had by then modified its offer to allow Hemphill to plead guilty with an agreed-to sentence of five years instead of seven years. The district court stated, "I think the Court, has an obligation to make sure that before a young person like Mr. Hemphill turns down and now extend it for one -- for five days, a five-year plea opportunity, that he be given enough time to think about that and make that final decision in light of this new evidence which has come to the Court's attention." Defense counsel indicated that he appreciated the opportunity to review the new evidence to see if it would be of any benefit, but the court indicated that the evidence could also be to the defense's detriment. The court stated that in order for Hemphill to be fully apprised of "the ups and downs of either going to trial or taking this five year offer," it would extend the deadline for accepting the plea offer until 8:30 a.m. on Friday, September 28, 2012.

The court and the parties then proceeded to discuss several evidentiary issues that might come up during the trial. Because the CI had been shot at and threatened, allegedly in telephone calls made by Hemphill, the Government apparently had relocated the CI. Defense counsel raised the possibility that questioning of the CI at trial could lead to a discussion of the

Government's relocation payments. The court indicated, however, that it "look[ed] at those jail calls more as a sentencing issue if we get to that point after a trial. If there's a plea, of course, the Court would approve the plea agreement, and there wouldn't be reasons to look at – and listen to those jail calls."

Defense counsel and the prosecutor both indicated there was nothing further for the court to take up. The court said, however, that it "ha[d] one other matter with Mr. Hemphill." Directly addressing the defendant, the court reminded Hemphill of the story it had told previously about the Nutall brothers, "that these young men, instead of doing – I think their case it was going to be six years. They're now doing 35." The court then said that "another example" was the case of "Mr. Mouton," who had played college football just as Hemphill had done but who "got into crack cocaine and weapons." The district court informed Hemphill that Mouton had been facing a 35- or 40-year sentence but eventually "got with the program" and accepted a ten-year offer from the Government. The court explained that after five years, it had granted a motion from the Government to reduce the sentence to five years and Mouton was released. According to the district court, Mouton returned to school, played football again, and went on "to play several years in arena football." The district court stated that Mouton was "married, doing well" and was "a success story." The transcript shows that the district court then appeared to give Hemphill a copy of a newspaper article about Mouton, stating that "Mr. Hemphill can take that back and think about it, think about his life, so forth."

The Court's colloquy with Hemphill concluded as follows:

> All right. So Mr. Hemphill, the marshals are going to bring you back over here Friday morning, this Friday [September 28, 2012], at 8:30. [Defense counsel] is going to talk with you about these jail phone calls, the videos, so forth. And then Friday morning at 8:30 you need to be ready to say yes or no to what the

government has offered. If you say no, and that's fine, that's your choice, then we will go to trial on Monday, October the 15th.

Do you understand that, Mr. Hemphill?

THE DEFENDANT: Yes, sir.

THE COURT: And there will be -- now, theoretically, after Friday, you can still plead what we call 'straight up,' but there won't be any agreement. If you just want to say, 'Okay, I plead guilty,' that's fine. But there won't be anything like what [the prosecutor] has suggested in terms of punishment, and the Court has indicated it will approve as of right now and as of Friday. But after that, it's either go to trial or plead straight up to the indictment to both crimes.

Do you understand that?

THE DEFENDANT: Yes, sir.

On the morning of September 28, 2012, Hemphill appeared in court and accepted the plea offer. Defense counsel initially indicated that "extreme developments" had occurred in the plea negotiations and asked to confer with Hemphill. After a twelve minute recess, Hemphill indicated that he had "[m]ore than enough" time to decide about accepting the offer. During the plea colloquy, the district court stated:

And so, Mr. Hemphill, the good part of this, the really good part is the government agreeing, number one, to waive its right to a jury trial, in which case it could prosecute you to the fullest extent of the law. And I think we calculated if the government were successful, you could have been looking at a sentence around somewhere 20 to 30 years. But the government has agreed to give up that right to fully prosecute, recommend -- or agree to five years in the penitentiary.

Hemphill filed a pro se motion to withdraw the plea on November 25, 2012, arguing in part that he had been under duress and that he had not received information that he had requested from his counsel until after his guilty plea. He also argued that the district court had violated Rule 11 by

improperly participating in the plea discussions.  Hemphill also filed a pro se motion to withdraw counsel.

At a subsequent hearing, defense counsel disputed that he had not provided Hemphill with information but conceded that communication had broken down with his client.  The district court granted the motion to withdraw counsel but denied the motion to withdraw the plea.  The court then appointed Hemphill new counsel.

Hemphill's new counsel filed a second motion to withdraw the guilty plea.  Counsel argued that Hemphill had construed the district court's comments about other defendants who had not accepted plea agreements as a threat designed to coerce him into accepting the plea.  Through counsel, Hemphill argued that because of the court's comments he had not believed that he would receive a fair trial and that the risk of not accepting a plea agreement apparently desired by the court was too great.  He further argued that he had been under duress because, despite repeated requests, he did not receive a copy of the plea agreement until reviewing it in court on September 28, and he had not been able to review the full details of the plea agreement prior to entering his plea.  Hemphill separately filed another pro se motion to withdraw the plea making the same arguments.

At sentencing, the district court denied the motion to withdraw the guilty plea.  The court approved the plea agreement and sentenced Hemphill, consistent with the terms of the agreement, to concurrent terms of 60 months in prison and eight years of supervised release.  Hemphill now appeals.

No. 13-50267

II.

The Federal Rules of Criminal Procedure permit an attorney for the Government and the defendant's attorney, or the defendant when proceeding pro se, to discuss and reach a plea agreement. Fed. R. Crim. P. 11(c)(1). "The court must not participate in these discussions." *Id.* The prohibition of participation by the district court in plea discussions is a "bright line rule" and constitutes "an absolute prohibition on all forms of judicial participation in or interference with the plea negotiation process." *United States v. Pena*, 720 F.3d 561, 570 (5th Cir. 2013) (internal quotation marks and citation omitted).

We have explained that this blanket prohibition admits of no exceptions and serves several important concerns. *United States v. Miles*, 10 F.3d 1135, 1139 (5th Cir. 1993). "First and foremost, it serves to diminish the possibility of judicial coercion of a guilty plea, regardless of whether the coercion would cause an involuntary, unconstitutional plea." *Id.* Second, any participation by the court "is likely to impair the trial court's impartiality. The judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement . . . and may therefore resent the defendant who rejects his advice." *Id.* (internal quotation marks and citation omitted). Third, participation by the court "'creates a misleading impression of the judge's role in the proceedings.'" *Id.* (citation omitted). This is because the judge no longer is a neutral arbiter but rather appears to be an advocate for the suggested plea agreement. *Id.*

We review allegations of a Rule 11 violation for harmless error. *United States v. Rodriguez*, 197 F.3d 156, 160 (5th Cir. 1999). We must consider whether it was reasonably probable that, but for the district court's comments, the defendant would have exercised his right to go to trial. *United States v. Davila*, 133 S. Ct. 2139, 2150 (2013); *United States v. Daigle*, 63 F.3d 346, 349 (5th Cir. 1995) ("The focus . . . of the harmless error inquiry is whether the

No. 13-50267

district court's flawed compliance with Rule 11 may reasonably be viewed as having been a material factor affecting the defendant's decision to plead guilty.").

III.

Hemphill argues that the district court impermissibly interfered with the plea negotiations in four ways: (1) by telling multiple stories about other defendants who faced a choice between going to trial and accepting a plea agreement; (2) by imposing a deadline on accepting the plea offer; (3) by making statements about the negative effects that the jail calls would have at sentencing; and (4) by describing the plea process as "good" during the plea colloquy. As noted above, we must address these contentions by asking, first, whether the district court's comments violated Rule 11, and, second, whether any error was harmless. *See United States v. Crowell*, 60 F.3d 199, 204 (5th Cir. 1995).

With respect to Hemphill's challenge to the district court's comments during the plea colloquy after Hemphill agreed to accept the offer, we perceive no error. "The district court is expected to take an active role in evaluating a plea agreement, once it is disclosed." *Id.* This evaluation "may include a consideration of the punishment allowable under the agreement, as compared to the punishment appropriate for the defendant's conduct as a whole." *Id.* Here, the district court's comment during the plea colloquy about the "really good part" being the Government's waiver of its right to prosecute Hemphill to the fullest extent of the law was an explanation by the court that Hemphill was facing a five-year sentence as opposed to 20 or 30 years. The comment was made *after* Hemphill had agreed to accept the offer. The comment was permissible and did not constitute error.

With respect to the court's comments occurring *before* Hemphill accepted the Government's plea offer, we come to a contrary conclusion. *See Pena,* 720

10

F.3d at 572 (noting the distinction between a sentencing court's comments made before the parties have agreed to a plea offer and disclosed its terms to the court, and the court's statements made after that time); *Crowell*, 60 F.3d at 204. Our main concern is with the district court's repeated description of similarly situated defendants and the consequences that befell them when they did not accept plea offers.[1]  The Government contends that the court was responding to Hemphill's pro se motions and that the comments were meant to ensure that Hemphill was aware of the consequences of rejecting the proposed plea agreement.  In context, and read in their entirety, however, the comments were coercive.

The district court's participation in plea discussions is necessarily limited in nature because such participation itself is generally coercive. *See Rodriguez*, 197 F.3d at 159 (holding that "pressure is inherent in *any* involvement by a judge in the plea negotiation process").  Thus, a*fter* a defendant has agreed to accept a plea offer, the district court is expected to take an active role by, *inter alia*, addressing the defendant in open court; determining that the plea is voluntary and not the result of force or threats; ensuring that there is a factual basis for the plea; and either accepting or rejecting the plea and stating its reasons for doing so.  *See Crowell*, 60 F.3d at 203; *see also Rodriguez*, 197 F.3d 156, 159 (5th Cir. 1999) ("Appropriate discussion of a plea agreement properly presented to the judge is limited to exploration of the agreement in order to determine whether it is voluntary and just.").  The proper inquiry is whether the court was actively evaluating a

---

[1] We find no fault per se with the court's imposition of a deadline for Hemphill to decide whether to accept the plea offer. *See United States v. Ellis*, 547 F.2d 863, 868 (5th Cir. 1977) (affirming district court's strict adherence to plea bargaining deadline as part of district court's control and management of its docket); *see also United States v. Cannady*, 283 F.3d 641, 645 (4th Cir. 2002) (indicating that giving the defendant "a relatively short time to decide" whether to accept a plea agreement was not coercive).

properly disclosed plea agreement, as the court is required to do, rather than suggesting what should occur or injecting comments while the parties are still negotiating. *Crowell*, 60 F.3d at 204.

The district court's comments here, made before Hemphill had accepted any plea, did not evaluate the effects of a plea agreement that had been properly presented by the parties. Instead, they tended to pressure Hemphill into accepting an offer that the court preferred. They further could be viewed as suggesting that the court already thought Hemphill was guilty.

On September 20, the court implicitly compared Hemphill's case with the cases of Williams and the Nutall brothers. On that date, Hemphill had already declared himself ready for trial, and he stated that he was not going "to lay down" by pleading guilty. The court conveyed that Williams and the Nutall brothers had also chosen to refuse plea offers and ended up serving much harsher sentences. The court even compared the video evidence in Williams's case with the video recordings in Hemphill's case, with the implication that, like Williams, Hemphill would also be found guilty based on such evidence.

Then on September 24, the day of trial, the district court unilaterally addressed Hemphill after the parties indicated there was nothing further to discuss. The court contrasted the prior case of Mr. Mouton, who the court characterized as a "success story" after Mouton accepted a plea offer and received a favorable sentence. The court clearly compared Mouton and Hemphill, noting that both men were about the same age and played football, suggesting that Hemphill could also expect positive results from accepting the plea but negative effects if he rejected the plea. The court then apparently gave Hemphill a newspaper article about Mouton, and stated that Hemphill should be given more time to consider the plea offer. The court's conduct and comment that Hemphill should "think about his life" were improperly coercive.

*See Rodriguez*, 197 F.3d at 159 (finding coercive district court's discussion of probable consequences of defendant's decisions and, when defendant indicated he wanted to go to trial, asking if the defendant was sure he wanted to do that).

Several of the district court's comments tended to exert pressure on Hemphill because they suggested the court had a predisposition to believe that Hemphill was guilty, even if such belief was only in Hemphill's mind. *See Pena*, 720 F.3d at 575 ("The pre-plea proceedings before the court, therefore, illustrate one of the core concerns that Rule 11 was intended to combat, i.e., the indeterminate effects of the court's involvement in plea negotiations, even if only in the defendant's mind."). On September 20, the court indicated that it had been unable to help the Nutall brothers because the Government would not agree to a release, and suggested uncertainty about being able to help Hemphill in a similar situation in the future because in "ten years" Hemphill would "still be in prison if you lose." The court's comparison of the video evidence in Williams's case with the evidence in Hemphill's case also tended to suggest a belief that Hemphill, like Williams, was guilty. On September 24, when discussing the jail calls, the court indicated that it viewed the calls as very important to sentencing, even though it had not yet listened to them. The court also indicated that if there were a plea agreement, of course, there would be no need to listen to the calls. The comments about the video evidence, the jail calls, and the probability of Hemphill still being in jail in ten years all suggest the *possibility* that the court had already made up its mind about Hemphill's guilt, and that therefore a plea agreement would be best. *See Pena*, 720 F.3d at 572 (holding district court's comments were improper where "the district court's statements connote the *possibility* that the court had already made a determination as to [the defendant's] guilt in the instant offenses and preferred a guilty plea"); *Miles*, 10 F.3d at 1141 ("By trying to facilitate a plea

bargain, the judge indicated that he desired an agreement; this is pressure enough." (internal quotation and citation omitted)).

The Government suggests that the district court's discussions were part of the court's effort to ensure that Hemphill was fully informed of the plea offer, and thereby comply with Supreme Court precedent. In two recent cases, the Supreme Court held that defendants could have viable claims for ineffective assistance if their counsel fails to communicate a plea offer and the defendant thereby loses the opportunity to plead to less serious charges or to receive a less serious sentence. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012); *Missouri v. Frye*, 132 S. Ct. 1399, 1408-09 (2012). The Supreme Court suggested that, in order to guard against later, frivolous claims of ineffective assistance, trial courts could adopt certain measures to ensure that defendants are fully informed, such as by documenting the terms of the negotiation process, by requiring that all plea offers be in writing, and by making any formal offers part of the record. *See Frye*, 132 S. Ct. at 1408-09.

Here, however, defense counsel had already indicated on the record that he had fully discussed the plea offer with Hemphill. The district court's comments then went much farther than documenting the plea offer or informing Hemphill of its terms, as contemplated in *Frye*. The district court clearly implied that a plea would be preferred, and it twice specifically stated that it would approve the Government's plea deal. *See Miles*, 10 F.3d at 1139 (holding that "the statements by the court went well beyond a mere rejection of the agreements and explanation for it; they suggested, at the very least, the agreements that would be acceptable").

Hemphill's case is similar to *United States v. Baker*, 489 F.3d 366 (D.C. Cir. 2007). Like the district court here, the district court in *Baker* unilaterally initiated a colloquy about a prior defendant who had received a lenient sentence of a year and a day after accepting a plea offer even though the

defendant had been facing a guideline range of approximately twelve years. *Id.* at 361. The district court stated that it would be consistent to the extent it could, and it encouraged the parties to talk again. *Id.* The District of Columbia Circuit held that the district court improperly engaged in plea discussions because the "only reasonable explanation" for the court's discussion of the prior defendant was to encourage a plea, in violation of Rule 11. The same is true here.

Hemphill's comments on the record indicate that he was reticent to accept a plea. The district court's repeated and extensive description of adverse consequences to other defendants who rejected pleas, and its discussion of the "success story" defendant who accepted a plea, were akin to the court advocating a preference for the proposed plea offer and the belief that the plea was in Hemphill's best interest. *See Rodriguez*, 197 F.3d at 160 ("The clear implication of the judge's statements at the pretrial hearing was that the judge desired a plea."); *Miles*, 10 F.3d at 1139 (quoting *United States v. Bruce*, 6 F.2d 552, 557 (9th Cir. 1992) ("The loss of judicial integrity is particularly serious when . . . the judge explicitly or implicitly advocates a particular bargain.")). This may have been laudable on the court's part, and we ascribe no ill motive to the district court. However, "Rule 11 and its interpretive case law unmistakably prohibit *all* forms of [judicial] participation." *Rodriguez*, 197 F.3d at 159 (emphasis added). The district court's actions, done with even the best of intentions, simply went too far, and there was error.[2]

Our next step is to determine whether the error was harmless. The Government bears the burden of showing that the district court's Rule 11 error

---

[2] Hemphill also argues that his placement in 24-hour lockdown immediately after the September 24 proceedings further contributed to the coercion of his plea. We need not decide the effect, if any, that the lockdown had on Hemphill's decision to plead guilty because the pressure exerted by the district court's commentary was sufficient to undermine confidence in the outcome of the plea proceedings.

was harmless in this case because Hemphill preserved the error. *See Davila*, 133 S. Ct. at 2147; *United States v. Vonn*, 535 U.S. 55, 62, 122 S. Ct. 1043, 1048 (2002). The Government argues that any violation of Rule 11 was harmless because Hemphill agreed to his guilt and the voluntariness of his plea under oath at his plea hearing; the district court directly reassured Hemphill of the court's impartiality; and the court made it clear to Hemphill that it was prepared to conduct a trial. The Government's argument misses the mark.

The district court's commentary occurred before Hemphill agreed to accept the offer and to enter his plea at the plea hearing. For the reasons noted above, the district court's commentary thereby created pressure in Hemphill's mind to accept a plea agreement or face a potentially harsher sentence as punishment. *See Rodriguez*, 197 F.3d at 159-60. Although the district court did indicate that it would be impartial and that Hemphill could proceed to trial, once a court has exerted pressure on a defendant it is difficult, if not impossible, to undo the coercive effects of that pressure. *See Pena*, 720 F.3d at 575 (holding that even district court's instruction to disregard an earlier, improper condition on entering a plea could not alter defendant's perception of court's desired disposition); *Rodriguez*, 197 F.3d at 160 ("Once the judge placed pressures on Rodriguez, their impact could not be so readily alleviated.").

We have held that "it is difficult to imagine a situation in which the court would find a judge's participation in the plea negotiation process to be harmless given the inherent pressure placed on the defendant." *Rodriguez*, 197 F.3d at 160. The Government argues, however, that rather than attribute Hemphill's acceptance of the plea offer to coercion by the district court, we may logically conclude that Hemphill accepted the plea offer on September 28 because the Government had reduced the agreed-to sentence from seven years to five years. But what "we do not and cannot know [is] whether [Hemphill]

would have accepted the plea agreement absent participation by the court." *Id.* The record in fact suggests otherwise.

Hemphill indicated on September 20 that he wanted to proceed to trial, he was diligently preparing for trial, and he gave no contrary indication prior to accepting the plea offer on the morning of September 28. The district court imparted the knowledge that several defendants who had rejected plea offers ended up suffering grave consequences, even though the district court had desired to help them. Then on the day of trial, September 24, the court contrasted the case of Mouton and said Hemphill should have more time to think about the plea offer. The district court at that time specifically referenced a five-year plea deal. The district court's comments were extensive, repeated, and unilaterally raised, and they were followed by the admonition for Hemphill to think about his life and whether to enter a plea. *See Baker*, 489 F.3d at 375 (finding harmfulness where district court's remarks "were lengthy, repetitive, initiated and pursued by the court, and accompanied by several concurrent suggestions that the parties 'talk again' and 'resolve this case'"). Four days later, after being admonished about similar defendants who had rejected pleas and receiving positive information about a defendant who had accepted a plea, Hemphill accepted the Government's plea offer. This temporal proximity between the district court's comments and the acceptance of the plea also supports a finding that the court's comments influenced Hemphill's plea. *See Davila*, 133 S. Ct. at 2149 (noting that a plea coming "soon after" judicial participation differs from one that follows a three-month delay); *Pena*, 720 F.3d at 574 (holding that a guilty plea entered five days after district court's participation was "a temporal proximity that supports a finding of prejudice").

We conclude that there is at least a reasonable probability that Hemphill would not have entered a guilty plea absent the district court's injection of

comments that went beyond merely evaluating a properly disclosed plea agreement. *See United States v. Johnson*, 1 F.3d 296, 302 (5th Cir. 1993) (en banc) (holding that under harmless-error review of Rule 11 errors we "'examine the facts and circumstances'" of the case to discern if the error "may reasonably be viewed as having been a material factor affecting [defendant's] decision to plead guilty'" (citation omitted)); *cf. United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S. Ct. 2333, 2340 (2004) (holding that a "reasonable probability" is one that, in the judgment of the reviewing court, is "'sufficient to undermine confidence in the outcome' of the proceeding" (citation omitted)).

## IV.

The district court did more than offer generic commentary about the pros and cons of plea offers. It gave specific examples of negative results for defendants who rejected plea offers, it compared the evidence in Hemphill's case with other cases, and it suggested through a "success story" that favorable results could occur when a defendant pleads guilty. The appropriate remedy is vacatur of Hemphill's judgment of conviction and remand for proceedings before a different district judge. *See Pena*, 720 F.3d at 576; *Rodriguez*, 197 F.3d at 160.

For the foregoing reasons, we VACATE the district court's judgment and REMAND for further proceedings before a different district judge.